**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**CONNIE SUYDAM,**

         **Plaintiff,**

-vs-                                                        **Case No. 6:04-cv-449-Orl-KRS**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF SOCIAL**
**SECURITY,**

         **Defendant.**

_____

## ORDER

This matter came before the Court for consideration without oral argument on the complaint filed by Connie Suydam seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for social security disability benefits. Doc. No. 1. The Commissioner answered the complaint and filed a certified copy of the transcripts of the proceedings before the Social Security Administration ("SSA"). Doc. Nos. 9, 13. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and Middle District of Florida Local Rule 6.05, for adjudication. Doc. Nos. 11, 12.

**I.   PROCEDURAL HISTORY.**

On March 2, 2001, Suydam applied for disability benefits under the Supplemental Security Income for Aged, Blind, and Disabled Program ("SSI"), 42 U.S.C. § 1382 *et seq.*, and the Federal Old Age, Survivors and Disability Insurance Program ("OASDI"), 42 U.S.C. § 401 *et seq.*, alleging a disability onset date of June 30, 1986. TR. 64-66, 377-81. The SSA denied Suydam's

applications both initially and on reconsideration. TR. 26-34, 382-90. Then, Suydam made a timely request for a hearing. TR. 40.

An Administrative Law Judge ("ALJ") held a hearing on April 10, 2003. TR. 391. Suydam, who was accompanied by her attorney, testified at the hearing. In addition, R. David San Filippo, a vocational expert, testified. TR. 391-420.

The ALJ found that Suydam had not engaged in substantial gainful activity since June 30, 1986, the alleged onset date of her disability. Supp. TR. 21.[1] The ALJ concluded that the medical evidence showed Suydam had the medically-determinable conditions of degenerative disc disease of the lumbar spine, stable adrenal gland tumor, hypertension, GERD,[2] and psoriasis, which are severe impairments under the SSA's regulations. TR. 16. These impairments did not meet or equal any listed impairment. TR. 18.

The ALJ found that Suydam's subjective allegations about the extent to which her impairments limited her ability to perform work were not entirely credible. TR. 17. The ALJ reasoned as follows:

> The claimant's subjective complaints and symptoms, including her allegations of pain and limitations as well as depression have been given a great deal of thought and carefully compared to the other evidence. The claimant's testimony and other reports reflects that she lives a sedentary lifestyle, which is consistent with the medical evidence. The claimant is able to take care of her personal needs. She is able to perform household chores, cook light meals, grocery shop, and laundry with help and watch television. She is able to drive, read the paper and eat out on

---

[1] The first three pages of the ALJ's opinion are missing from the primary record in this case. The Commissioner filed a supplemental record containing the ALJ's opinion in full, which I cite as "Supp. TR."

[2] GERD refers to gastroesophageal reflux disease, or a backflow of acid from the stomach into the swallowing tube or esophagus. International Foundation for Functional Gastrointestinal Disorders, *About GERD at* http://www.aboutgerd.org (last visited Sept. 8, 2005).

> weekends. The claimant testified that she could lift ten pounds. There are no reported side effects from medication. Activities and reports such as these are inconsistent with her allegations of incapacitating limitations or pain. This is not to minimize the medical impairment demonstrated in the record. The claimant does have impairments that limit her activities such as heavy lifting or prolonged standing and walking. However, the clinical findings resulting from these impairments do not appear to be of a degree capable of producing pain or limitations of incapacitating proportions. Accordingly, the undersigned finds that the claimant's allegations and subjective symptoms are out of proportion and inconsistent with the medical evidence and are not fully credible.

Supp. TR. 20.

The ALJ found that Suydam had the residual functional capacity to stand and walk two hours in an eight-hour workday, sit for six hours in an eight-hour workday, and lift ten pounds. In addition, the ALJ found that Suydam would have frequent limitations in climbing, balancing, kneeling, crouching, and crawling. He found that Suydam would have occasional limitations in stooping, and mild deficiencies in concentration, persistence, or pace. TR. 18. In reaching this conclusion, the ALJ relied on the opinion of Dr. Dunham, who, the ALJ wrote, had limited Suydam to "sedentary work consisting of standing and walking two hours in an eight-hour workday, sitting six hours in an eight-hour workday, and lifting ten pounds . . . ." Supp. TR. 20.

The ALJ found that Suydam had past relevant work as an office clerk. Supp. TR. 20. In that job, which she last performed in 1986, Suydam operated a computer, typewriter, and copy machine. The job required sitting eight hours a day, and did not require lifting. Supp. TR. 18. The ALJ determined that this work was within Suydam's RFC, and, therefore, that Suydam could return to this work. Supp. TR. 20-21.

Suydam requested review of the ALJ's decision.  TR. 6-7.  On February 19, 2004, the Appeals Council found no basis for changing the ALJ's decision.  TR. 3-4.  Suydam timely sought review of this decision by the United States District Court.  Doc. No. 1.

**II.     JURISDICTION.**

The Commissioner issued a final decision after a hearing with respect to Suydam's application for disability benefits under OASDI and SSI.  Therefore, the Court has jurisdiction of this matter under 42 U.S.C. §§ 405(g), 1383(c)(3).

**III.    STATEMENT OF FACTS.**

A.     *Suydam's Testimony.*

Suydam was born on November 15, 1941.  TR. 394.  She is five feet five inches tall and weighed 215 pounds at the time of her hearing.  TR. 394.  She holds a high school diploma.  TR. 396.

Suydam has not worked since 1986.  TR. 396.  From 1976 to 1986, she worked as an office clerk for the city government of Salem, Oregon.  TR. 397.  The job required her to use office equipment such as typewriters, copy machines, telephones, and computers.  TR. 397-98.  The position as a clerk required Suydam to know and apply the city's rules and regulations and prepare reports regarding projects undertaken by the city.  TR. 398.  She worked eight hours each day.  TR. 398.  Suydam spent almost all of her working time "sitting in a chair," and she did not do any lifting or carrying.  TR. 398-99.  From 1971 to 1976, Suydam worked for the personnel department of the Florida Department of Transportation.  TR. 399.  This involved the same type of work as her

position as a clerk in Oregon, except that she did not have to prepare reports in her Department of Transportation job.  TR. 400.

Suydam's disability derived from pain in her back, which first stemmed from an automobile accident in 1990.  TR. 400-01.  She also had another injury-causing automobile accident in 1998.  TR. 401.  She experienced sharp pain in her lower back, which was "bad" three or four days per week.  TR. 402.  The pain radiated to her legs, and her sciatic nerve would bother her.  TR. 402, 415. She complained that the pain in her back made it hard to sit, walk, or stand for longer than approximately twenty or thirty minutes at a time.  TR. 406.  Suydam's doctor instructed her not to lift more than ten pounds.  TR. 406.  She had problems bending, kneeling, and stooping due to pain.  TR. 407.

After her 1990 accident, doctors prescribed Tylenol 3 and Valium to treat her pain.  TR. 405.  At the time of her hearing, Suydam was taking various medications including Celebrex for arthritis, hydrocodone for pain, and Wellbutrin to reduce anxiety.  TR. 409-10.  Some of her medications made her nauseated, and her pain pills made her tired and groggy.  TR. 411.  To treat her back, Suydam has undergone physical therapy on two or three occasions, and she had been to water therapy.  TR. 413.  Suydam used a cane sporadically after her 1998 automobile accident. TR. 408.

Suydam had approximately three or four days per week when her pain was "kind of mediocre," a four or five on a scale of ten being the most severe pain.  TR. 414.  On bad days, her pain was a seven or eight on a scale of ten, and she seemed to have more bad days than good days.

TR. 414. To alleviate her pain, she would lie down in a special position for at least half an hour. TR. 414. She had to lie down several times each day. TR. 414.

Suydam drove her car. TR. 395. She drove about twenty-minutes to attend her hearing. TR. 396. She was able to care for herself. TR. 407. Regarding housework, she washed dishes, dusted, and did laundry with her husband's help. TR. 407-08. She did some shopping with her husband. TR. 408. She did not sweep or make the bed, because those jobs required a twisting motion that her doctor had forbidden. TR. 408.

  B. *Vocational Expert Testimony.*

At Suydam's hearing before the ALJ, a vocational expert ("VE") testified regarding Suydam's ability to perform work based on a review of Suydam's medical records and her testimony. TR. 415-16. The VE testified that Suydam's past work was a semiskilled occupation and sedentary in nature. TR. 417.

The ALJ posed the following hypothetical individuals to the VE:

ALJ: Okay, we have a Claimant who, at the time of the alleged onset date, was considered a younger person under Social Security regulations. She turns, she turned 50 in November of '91, at which time she would be considered closely approaching advanced age, and on November 15 of '96, she turned 55. That would be considered of advanced age. And in November of 2001, she turned 60, at which time she will be considered closely approaching retirement age under Social Security regulations. She has a twelfth grade education, work experience as she has described. Assume, assume that I find that she has the following residual functional capacity. From a mental standpoint, she was, she suffered from dysthymia or depression, with a Global Assessment of Functioning of 65, the past year, this was done in . . . 2001, and 75 in the past year. The current GAF or Global Assessment of Functioning of 65, past year, 75, which were described a mild condition from a mental standpoint. Exhibit 13F describes the impairment from a psychiatric standpoint was not severe. Then from a physical standpoint, exertional standpoint, she could lift and or carry occasionally 50 pounds, and frequently 25 pounds, stand and or walk between about six hours in an eight hour work day, and

>sit about six hours in an eight hour work day, and push and pull unlimited. Climbing ramps, stairs, occasionally, with no other restrictions described. Would she have been able to perform past relevant work?
>
>VE:   Yes, sir.
>
>ALJ:   Okay, well, let's go with the second hypothesis, same person, younger individual, until November 1990, when she turned closely approaching advanced age, in November 1996, when she turned of advanced age, and 2001, when she turned closely approaching retirement age with a twelfth grade education, work experience as she had described. The residual functional capacity will be the same as in hypothesis number one as far as lifting and carrying, standing and walking, sitting, and pushing and pulling. Postural limitations, stooping would be occasionally with no other restrictions. And from a mental standpoint, the restrictions would be the same impairment nonsevere with a difficulty maintaining concentration, persistence and pace being mild. Would she be able to perform past relevant work?
>
>VE:   Yes, sir.
>
>ALJ:   Assume that I gave full credit to the Claimant's testimony as given here today, or that she's only able to sit for 30 minutes at a time, stand 10 to 15 minutes at a time, walk 20 minutes, lift and carry 10 pounds, bending will cause pain, same as kneeling, stooping a little, are there, the definition of a sedentary work in the Social Security regulations bending, kneeling, and stooping is not a requirement, would she be able to perform past relevant work?
>
>VE:   No, I don't believe so. She would not be able to perform the full range of sedentary work because of the, of her sitting restrictions.
>
>ALJ:   Are there any jobs within the national economy that she would have been able to perform?
>
>VE:   No, sir.

TR. 417-19.

C.   *Medical Evidence.*[3]

From March 6, 1989, to July 31, 1991, Suydam sought treatment from Michael N. Fulton, M.D., for low back pain. TR. 114-22. On March 6, 1989, Dr. Fulton noted that Suydam was complaining of back pain following an automobile accident. TR. 122. Suydam complained of a constant ache in her lower spine with occasional "catching." TR. 122. Dr. Fulton performed an orthopaedic exam. His impressions were low back pain without sciatica,[4] probable mechanical pain related to tropism at L5-S1 (bat wing transverse process),[5] and that degenerative disc disease needed to be ruled out. TR. 121. Dr. Fulton prescribed anti-inflammatory medication, and noted that if the medication did not improve Suydam's condition that an MRI of her spine would be ordered. TR. 121. On March 15, 1989, Dr. Fulton noted that Suydam's condition had not improved, so he began a MedX protocol.[6] TR. 120.

On June 26, 1989, Dr. Fulton noted that the MedX protocol improved Suydam's pain, though she was still experiencing discomfort. TR. 119. On September 5, 1989, Dr. Fulton noted that Suydam demonstrated eighty degrees of trunk flexion and ten degrees of extension. A

---

[3] I will not review the records regarding mental impairments, because Suydam does not challenge the ALJ's assessment that her mental impairments were not severe.

[4] Sciatica refers to pain in the low back, which radiates to the legs and is caused by a herniated lumbar disc. STEDMAN'S MEDICAL DICTIONARY 1580 (26th ed. 1995) (hereinafter "Stedman's").

[5] In this context, the term tropism (bat wing transverse process) refers to a congenital anomaly of the vertebrae in which a vertebrae develops characteristics of the adjoining region. Educational Council on Osteopathic Principles, *Glossary of Osteopathic Terminology* 19 (April 2002), *available at* www.md-do.org/Files/glossary%20osteopathy.pdf (last visited Sept. 8, 2005). The term L5-S1 refers to a specific vertebra.

[6] A MedX protocol is a treatment involving spinal manipulation and exercise administered by a machine. *See* Gert Bronfort, et al., *A Randomized Clinical Trial of Exercise and Spinal Manipulation for Patients with Chronic NeckPain*, abstract available at http://www.spinejournal.com/pt/re/spine/abstract.00007632-200104010-00020. htm;jsessionid=CucBKaXLixygb7TmmLc9kHaGTXSO9UFvIgddjQiA619Og1u8AkZX!1988335901!-949856145!9001!-1 (last visited Sept. 8, 2005).

straight-leg raising test was negative.[7] TR. 118.  Because Suydam's condition did not improve, Dr. Fulton placed her on a Medrol Dosepak in October 1989.[8]  TR. 117.  On December 19, 1989, Dr. Fulton noted that Suydam had completed four epidural injections and that she reported less severe leg pain.  TR. 117, 360, 366.

Medical Records dated in July and April 1990 indicate that Suydam's condition continued to improve to the point of maximum medical improvement with an overall impairment rating of 5% to 10%.  Dr. Fulton discontinued Suydam's rehabilitation program.  However, he continued to treat her for pain, including prescribing anti-inflammatory medication and muscle relaxants.  TR. 115.  On April 9, 1991, Dr. Fulton opined that Suydam could only perform sedentary work, with "limited hours of no more than 4 hours and will have to change her posture at least at hourly intervals."  TR. 114.

Interspersed in the transcript are records reflecting care Suydam received at Bert Fish Medical Center in New Smyrna, Florida in 1998, 1999, 2000 and 2001.  *E.g.*, TR. 150-233, 369-76.  These records mostly reflect treatments and examinations that are irrelevant to Suydam's disabling conditions and, to the extent that they are relevant, they are redundant with other medical records discussed more fully in this Order.  These records reflect that Suydam has a history of hypertension and depression.  *See, e.g.*, TR. 228.

---

[7] "'The simple straight-leg raising test [SLR] is performed with the patient lying supine, with the backs of the knees flat on the examining table. The knee is held straight, and the foot of one leg is raised while the hip is slowly flexed. Flexion of the leg through a range of 60 to 90 degrees is considered to be normal. The test is positive when pain is reproduced down the posterior thigh below the knee between the angle of 30 to 70 degrees.'" *Menezes v. Apfel*, No. CIV. 99-168-B., 2000 WL 1499491, at *1 n.7 (D.N.H. May 4, 2000) (quoting ATTORNEYS' TEXTBOOK OF MEDICINE ¶ 15.34(1) (3d ed.1999)).

[8] Medrol is a steroid that is used to prevent inflammation.  Cerner Multum, Inc., *Medrol*, DRUGS.COM, *at* http://www.drugs.com/MTM/M/Medrol.html (last visited Sept. 8, 2005) (hereinafter "Drugs.com").

Medical records dated August 17, 1998, and August 14, 2000, indicate that Valerie G. Davis, M.D., treated Suydam for psoriasis. TR. 135. Dr. Davis prescribed Dovonex[9] for Suydam and noted that her other medications were possibly exacerbating her psoriasis. TR. 135.

From July 1999 to September 2000, Suydam received treatment for her low back and right buttock pain from Charles E. Kollmer, M.D. TR. 136-48. On her first visit to Dr. Kollmer on July 13, 1999, Suydam complained of pain in her low back radiating to her right knee resulting from a motor vehicle accident in June 1999. Suydam told Dr. Kollmer that the earlier problems with her back resolved before the most recent accident, and that she had not had difficulties with her back for more than ten years. TR. 147. Dr. Kollmer noted that Suydam had a positive hyperextension test.[10] TR. 147. Her forward flexion was 50 degrees with pain on the right side. TR. 147. Suydam had sciatic tenderness and a positive straight-leg raising test. TR. 147. In addition, she had minimal tenderness to the greater trochanteric bursa on her right side. TR. 147. Dr. Kollmer's diagnoses were the following: (1) lumbosacral strain with degenerative scoliosis;[11] (2) right lower extremity radiculopathy; and (3) degenerative disc disease. TR. 147. Dr. Kollmer placed Suydam on Celebrex.[12] TR. 148. An MRI taken in December 1999, disclosed multiple levels of

---

[9] Dovonex is an ointment medication which enhances the body's ability to transport nutrients to skin and is used to treat psoriasis. Drugs.com *at* http://www.drugs.com/PDR/Dovonex_Ointment.html (last visited Sept. 8, 2005).

[10] The hyperextension test is "performed with the patient standing. The trunk [is] mobilized passively and slowly over the full range of extension with the knees in extension. The test [is] positive if the sciatica [is] reproduced or worsened. If the manoeuvre [is] interrupted because of lumbar pain, it [is] considered negative." S. Poiraudeau, et al., *Value of the Bell Test and the Hyperextension Test for Diagnosis in Sciatica Associated with Disc Herniation: Comparison with Lasègue's Sign and the Crossed Lasègue's Sign*, 40 RHEUMATOLOGY 460-66 (2001), *available at* http://rheumatology.oxfordjournals.org/cgi/content/full/40/4/460 (last visited Sept. 8, 2005).

[11] Scoliosis refers to an abnormal curvature of the spinal column. Stedman's at 1584.

[12] Celebrex is a non-steroidal anti-inflammatory drug. Drugs.com *at* http://www.drugs.com/celebrex.html (last visited Sept. 8, 2005).

degenerative disk disease in her lumbar and sacral spine. TR. 142. Dr. Kollmer diagnosed severe degenerative disk disease of the lumbosacral spine with right-sided sciatic. TR. 141. He prescribed medication and aqua therapy. TR. 136-37, 139-40.

From August 31, 1999, to October 26, 1999, Suydam had a number of appointments with Anne I. Dunham, M.D., seeking treatment for low back and leg pain. TR. 123-27. X-rays showed minimal degenerative joint disease of the right hip, and some degenerative scoliosis with degenerative disk disease. TR. 127. Dr. Dunham diagnosed Suydam with lumbar radiculopathy[13] and degenerative disc disease of the lumbosacral spine. TR. 127. Dr. Dunham recommended a series of epidural steroid injections and injected Suydam with Celestone.[14] TR. 127. At subsequent visits, Dr. Dunham reached the same diagnosis and administered the same treatment. In addition, Dr. Dunham prescribed Elavil[15] and Neurontin[16] for Suydam, and recommended lotions to treat thoracic shingles (herpes zoster), which was a skin problem Suydam had developed.[17] TR. 123-24. Despite the treatment, Suydam still complained of low back pain. TR. 123.

---

[13] Radiculopathy refers to a disorder of the spinal nerve roots. Stedman's at 1484.

[14] Celestone is a steroid used to treat inflamed areas of the body. Drugs.com *at* http://www.drugs.com/cons/Celestone.html (last visited Sept. 8, 2005).

[15] Elavil is a tricylic antidepressant medication. Drugs.com *at* http://www.drugs.com/elavil.html (last visited Sept. 8, 2005).

[16] Neurontin is a drug that neutralizes chemicals in the body that cause seizures and pain. Drugs.com *at* http://www.drugs.com/neurontin.html (last visited Sept. 8, 2005).

[17] Herpes zoster is an infection caused by the herpes virus, characterized by an eruption of groups of vesicles on one side of the body following the course of a nerve due to inflammation. This condition is commonly known as shingles. Stedman's at 790-91.

In October and November 1999, Suydam visited Anthony C. Picchiello, M.D., several times. TR. 128-35. On October 12, 1999, Suydam complained to Dr. Picchiello that she had a "gripping type pain in her right buttock, with shooting and burning pain in the right posterior lateral aspect of the right leg." TR. 132. Dr. Picchiello diagnosed her with the following impairments: (1) degenerative disc disease, lumbosacral spine; (2) lumbar radiculopathy, more in L5-S1 distribution; (3) sacroiliac joint disfunction; (4) depression; and (5) herpes zoster. TR. 133. He recommended continued treatment with Neurontin and other medication. TR. 128-31.

On December 23, 1999, Jerry L. Brand, M.D., interpreted an MRI of Suydam's lumbar spine. TR. 204. Dr. Brand noted several degenerative changes in her spine. TR. 204-05. Dr. Brand's impression was mild focal posterocentral disc annulus bulge at three vertebral levels,[18] hypertrophic degenerative facet changes, and degenerative disc disease. TR. 205.

On May 31, 2001, William Gilmer, M.D., examined Suydam at the request of the Florida Office of Disability Determinations. TR. 234-37. Suydam reported that she had chronic back pain radiating to her foot for which she had been taking Lortab on a daily basis for ten years. TR. 234. Upon examination, Dr. Gilmer noted that Suydam had decreased range of motion in her thoracic spine. TR. 236. Dr. Gilmer's impressions were as follows: (1) adrenal gland tumor; (2) hypertension; (3) GERD; (4) psoriasis; (5) generalized osteoarthritis; (6) chronic lumbar pain syndrome; and (7) exogenous obesity. TR. 237.

On July 17, 2001, John Carroll, M.D., interpreting the results of an X-ray of Suydam's spine, found the following: (1) disc space narrowing at the L2-3, L3-4, and L4-5 levels; (2)

---

[18] This diagnosis apparently refers to a condition in which a spinal disc, or a piece of cartilage that rests between the vertebra, has bulged out of its proper place and formed a sort of ring-shaped protrusion. *See* Stedman's at 93.

minimal levocurvature at the lumbar spine; and (3) facet hypertrophy at the right L2-3 level and at the L4-5 levels bilaterally.  TR. 339.  On July 25, 2001, Sandra Rausch, M.D., examined Suydam to investigate her complaints of ingrown toenails and a swollen ankle.  TR. 332.  Dr. Rausch noted that Suydam's weight was 213 pounds.  TR. 332.  Dr. Rausch advised her to keep her feet elevated and to soak them in Epsom salt.  TR. 333.

From June 2001 to January 2002, Suydam visited Anthony Caton, M.D., on a number of occasions.  TR. 292-314, 330-31, 334-37, 348-52.  Dr. Caton monitored the mass that had formed on Suydam's adrenal gland, and noted that it remained stable.  TR. 305, 298.  On several occasions, Dr. Caton assessed Suydam with chronic back pain, eczema, hypertension, a stable adrenal mass, hypercholesteremia, GERD, benign colon polyps, arthritis, allergic sinusitis, depression, and a hand tremor.  TR. 294-95, 298-99, 305-06, 309-10, 314, 330-31, 335-37, 351-52.  Dr. Caton also noted that Suydam's weight was 227 pounds and that she was moderately obese.  TR. 294.

      D.    *Reviewing Physicians' Opinions.*

On June 15, 2001, Reuben E. Brigety, M.D., an OB/Gyn specialist, completed a physical residual functional capacity ("RFC") assessment based on a review of Suydam's medical records.  TR. 243-50.  Dr. Brigety opined that Suydam could lift fifty pounds occasionally and sit, stand or walk for six hours in an eight-hour workday.  TR. 244.  Suydam would be occasionally limited in climbing and frequently limited in balancing, stooping, kneeling, crouching, and crawling.  TR. 245.  On November 2, 2001, Alan G. Tetlow, M.D., an anesthesiologist, completed a physical RFC assessment of Suydam.  TR. 270-77.  Dr. Tetlow opined that Suydam could occasionally lift

or carry fifty pounds, frequently lift or carry twenty-five pounds, and sit, stand or walk for six hours in an eight-hour workday. TR. 271.  Dr. Tetlow further opined that Suydam would be frequently limited in her ability to climb, balance, kneel, crouch, and crawl and occasionally limited in her ability to stoop.  TR. 272.

## IV.     STANDARD OF REVIEW.

To be entitled to Social Security disability benefits under OASDI and SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(C).  The Act provides further that a claimant is not disabled if he or she is capable of performing his previous work.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  In a case seeking disability benefits under SSI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the

existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982) (internal quotations omitted).

The court "'must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision.'" *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir. 1987) (quoting *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986)).  Even if the court finds that the evidence weighs against the SSA's decision, the court must affirm if the decision is supported by substantial evidence. *See Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The court may not reweigh the evidence or substitute its own judgment, even if the court finds that the weight of the evidence is against the SSA's decision.  *Id.*  While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).

**V.     ANALYSIS.**

The Commissioner concedes that the ALJ erred by relying on Suydam's work in 1986 as past relevant work in denying her application for SSI benefits.  Reliance on this work was erroneous because the job was performed more than fifteen years before Suydam's application for SSI benefits.  Therefore, the Commissioner asks that the Court reverse her decision as to SSI benefits only, and remand the case for further proceedings.

With respect to OASDI benefits, however, the Commissioner contends that her decision should be affirmed because Suydam's work in 1986 was within fifteen years of the date Suydam

was last insured, which was December 31, 1991. Supp. TR. 21. Suydam asserts that the Commissioner's decision regarding OASDI benefits must be reversed, however, for the following reasons: substantial evidence did not support the ALJ's conclusion that a treating doctor concluded in 1990 that Suydam could work eight hours a day; the ALJ erred by relying upon a vocational expert's opinion at step four of the analysis; the ALJ did not properly evaluate Suydam's complaints of pain; and the ALJ did not consider Suydam's impairments in combination. I address only the first of these arguments, because I find it to be dispositive.

Suydam contends that the ALJ's RFC finding was erroneous because it was based on a misinterpretation of her medical records. Specifically, the ALJ stated that he relied on the 1990 opinion of Dr. Dunham that Suydam could perform sedentary work consisting of standing and walking two hours and sitting six hours in an eight-hour day, and lifting ten pounds. Supp. TR. 19-20. However, the treating physician who evaluated Suydam in 1990 was Dr. Fulton, not Dr. Dunham. TR. 115-16. More significantly, Dr. Fulton's records reflect that Suydam was limited to sedentary work with "limited hours of no more than 4 hours and will have to change her posture at least at hourly intervals." TR. 114.

Dr. Fulton's RFC assessment does not provide substantial evidence to support the ALJ's conclusion that Suydam could work eight-hours a day, whether sitting, standing, or walking. I have not found, and the Commissioner does not cite to any other RFC assessment in the record addressing Suydam's condition as of the date she was last insured under OASDI.

The Commissioner did not address the misreading of Dr. Fulton's RFC assessment in her memorandum of law. Instead, she relied upon other evidence in the record that might have

-16-

supported the ALJ's decision.  However, the Court may not affirm a decision simply because some basis might have supported it, if the stated reasons are insufficient to sustain the Commissioner's decision.  *See Owens v. Heckler,* 748 F.2d 1511, 1516 (11th Cir. 1984).  Because the stated basis of the ALJ's decision about Suydam's residual functional capacity is not supported by substantial evidence in the record, reversal and remand is required as to both the OASDI and SSI disability determinations.

## VI.   CONCLUSION.

For the reasons stated above, the decision of the SSA is **REVERSED** and the case is **REMANDED** for further proceedings.  It is further **ORDERED** that the Clerk of Court shall issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** in Orlando, Florida on September 12, 2005.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties